IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States,<br><br>Plaintiff,<br><br>v.<br><br>David Jess Miller, Minnesota Independent Cooperative,<br><br>Defendants. | Case No. 15-cr-00234-CRB-28<br>16-cr-225-CRB-1<br>16-cr-226-CRB-4<br><br>**ORDER DENYING MOTION FOR ACQUITTAL** |

On January 25, 2023, a jury convicted David Jess Miller ("Miller") on 14 counts: Racketeering Conspiracy under 18 U.S.C. § 1962(d) (Count 1); Conspiracy to Commit Mail and Wire Fraud under 18 U.S.C. § 1349 (Count 2); Mail Fraud under 18 U.S.C. § 1341 (Counts 3 through 12); Conspiracy to Commit Money Laundering under 18 U.S.C. § 1956(h) (Count 13); and Conspiracy to Commit Unlicensed Wholesale Distribution and False Statements under 18 U.S.C. § 371 (Count 14). See Verdict Form (dkt. 1839). The jury also convicted Miller's company, Minnesota Independent Cooperative ("MIC"; together, "Defendants"), on 11 counts: Mail Fraud under 18 U.S.C. § 1341 (Counts 3 through 12); and Conspiracy to Commit Unlicensed Wholesale Distribution and False Statements under 18 U.S.C. § 371 (Count 14). Id. Defendants now move for a judgment of acquittal or, in the alternative, a new trial. Mot. (dkt. 1857).

Finding this motion suitable for resolution without oral argument, the Court VACATES the hearing on the motion set for May 3, and DENIES Defendants' motion.

## I. BACKGROUND

In February 2016, the government filed a second superseding indictment charging 38 defendants in a wide-ranging conspiracy to purchase and distribute millions of dollars' worth of improperly procured prescription drugs. Second Superseding Indictment (SSI) (dkt. 502). Miller was described as "own[ing], operat[ing], and control[ing] a variety of drug wholesale businesses," including MIC, E-Tail Network, B&Y Wholesale Distributors, and FMC Distributors. SSI ¶ 9. The indictment charged that, beginning in 2009, Mihran and Artur Stepanyan began supplying Miller and MIC with "large amounts of [prescription] drugs" they received from Yan German, Ara Karapedyan, and others. Id. ¶ 12. Miller and MIC employees then packaged the drugs and sent them either to MIC's warehouse in Minnesota, or directly to MIC's customers. Id. ¶ 13. Miller and MIC employees then created pedigrees showing that the drugs came from other sources, such as B&Y Wholesale Distributors, which was in fact a front company run by Miller himself. Id. Miller and MIC then made the false pedigrees available to their customers, to deceive them into thinking that the drugs came from B&Y when they did not. Id. ¶ 14. For his participation in the scheme, Miller was charged with racketeering conspiracy, conspiracy to commit identity theft, conspiracy to commit access device fraud, conspiracy to commit mail, wire, and bank fraud, conspiracy to commit money laundering, and conspiracy to engage in the unlicensed wholesale distribution of drugs. Id. ¶¶ 29–61.[1]

In June 2020, the government dismissed the identity theft, access device fraud, and bank fraud counts against Miller, see dkt. 1529, and trial on the remaining counts commenced on January 9, 2023. At the conclusion of trial on January 25, the jury convicted Miller on all fourteen counts, and MIC on all eleven counts. See Verdict Form. Defendants moved for a judgment of acquittal at the close of trial, and the motion is now fully briefed. See Mot.; Opp'n (dkt. 1920); Reply (dkt. 1955).

---

[1] Both defendants (Miller and MIC) were also charged in an indictment in the Southern District of Ohio that was transferred to this district in 2016. See Ohio Indictment, 16-cr-225, dkts. 1-1, 1-2. That indictment charged Defendants with conspiracy to commit mail and wire fraud, mail fraud, and conspiracy to commit unlicensed wholesale distribution and false statements. Id. The charges in the two indictments were consolidated for trial.

2

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient to sustain a conviction if, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt." United States v. Nevils, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Thus, the Court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." Id. at 1164. "Therefore, in a case involving factual disputes and credibility determinations," the Court "'must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" United States v. H.B., 695 F.3d 931, 935 (9th Cir. 2012) (quoting Nevils, 598 F.3d at 1164). "Circumstantial evidence 'can be used to prove any fact,' although 'mere suspicion or speculation does not rise to the level of sufficient evidence.'" United States v. Dinkane, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990)). "The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." Id. (quoting United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)).

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Unlike with Rule 29, "[t]he court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." United States v. Kellington, 217 F.3d 1084, 1097 (9th Cir. 2000). If, "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the court may set aside the verdict and

1  grant a new trial. Id. (quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).

## III. DISCUSSION

Defendants argue that the evidence was insufficient to convict on the following charges: the racketeering conspiracy (Count 1); conspiracy to commit mail and wire fraud and substantive mail fraud (Counts 2 through 12); and money laundering (Count 13).[2]

### A. Count 1: RICO Conspiracy

Miller[3] argues that a judgment of acquittal must be entered on the racketeering conspiracy charge (Count 1) because the government did not prove the existence of the charged "Karapedyan–Stepanyan Enterprise," nor that Miller was "employed by or associated with" such an enterprise or agreed to "conduct or participate" in that enterprise. See Mot. at 2–5.

#### 1. Enterprise

The second superseding indictment describes the "Karapedyan–Stepanyan Enterprise" as comprising 56 people and entities (including Miller and MIC), "constitut[ing] an ongoing organization . . . for a common purpose of achieving the objectives of the enterprise," which included "[o]btaining profits and property for its members and associates through the commission of criminal acts, including . . . mail, wire, and bank fraud, the unlicensed wholesale distribution of drugs, and money laundering." SSI ¶¶ 30–31. To conduct the enterprise, the indictment charged that the participants engaged a variety of means and methods, including "creat[ing] shell businesses to engage in the sale of improperly procured and handled drugs," and "creat[ing] false drug pedigree information . . . to facilitate their sales of improperly procured and handled drugs." Id. ¶ 32.

To convict on a racketeering conspiracy charge, the government must prove the

---

[2] Defendants do not appear to challenge their convictions for conspiracy to commit unlicensed wholesale distribution and false statements (Count 14).

[3] MIC was not charged in Count 1.

4

following: (1) "there was an on-going enterprise with some sort of formal or informal framework for carrying out its objectives, consisting of a group of persons or entities associated together for a common purpose of engaging in a course of conduct;" (2) "the defendant was employed by or associated with the enterprise"; (3) "the defendant conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity;" and (4) "the enterprise engaged in or its activities in some way affected commerce between one state and another state." Jury Instructions (dkt. 1832) at 24; Ninth Circuit Model Jury Instructions § 18.18. The Court also instructed the jury on the elements of conspiracy generally, which requires (1) "that there was an agreement between two or more persons to commit a crime," and (2) "that the defendant became a member of the alleged conspiracy knowing of at least one of its objects and intending to help accomplish it." Jury Instructions at 21; Ninth Circuit Model Jury Instructions § 11.1.

The jury instructions provided a name for the enterprise, the "Karapedian–Stepanyan Enterprise," and asked the jury to decide whether it was an "enterprise," namely, "a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time." Jury Instructions at 25; Ninth Circuit Model Jury Instructions § 18.9. While the group of people "must have an ongoing organization, either formal or informal," the "personnel of the enterprise . . . may change" and "the government need not prove that the enterprise had any particular organizational structure." Id. The Court also instructed that "one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." Jury Instructions at 23; Ninth Circuit Model Jury Instructions § 11.4.

Miller argues that the government did not—and could not—prove the enterprise it charged in the second superseding indictment, the so-called "Karapedyan–Stepanyan Enterprise." See Mot. at 4–5. Instead, Miller contends that the government's closing argument charged a different enterprise entirely, one comprised of "Miller, MIC, and MIC's suppliers." Id. at 4. By asking the jury to disregard the name of the enterprise—

5

which was arguably "the only description of the charged enterprise the jury received"—Miller argues that the government engaged in a "constructive amendment" of the racketeering conspiracy charge to obtain a guilty verdict at trial. Reply at 3 (emphasis omitted).

But the "Karapedyan–Stepanyan Enterprise" is not a description; it is a name, for a charged racketeering conspiracy made up of 56 different people and entities. SSI ¶ 30. To the extent that the "Karapedyan–Stepanyan Enterprise" describes some of the participants in the conspiracy, the jury was aware—because it was so instructed—that "one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." Jury Instructions at 23. By naming the enterprise, the jury was not instructed to assume that any direct association between the members named was required, see Mot. at 3–4; in fact, they were instructed of the opposite.

Further, to the extent that the government described the enterprise for the jury in its closing argument, its description comports with the description of the enterprise in the indictment. Below is the government's description of the enterprise at closing:

> So what is the enterprise? So here you have Miller. You have MIC. You have the suppliers. And if you think about it, you know, one way to conceptualize it is if you have MIC in the middle, right? So it doesn't have to be a formal entity, but here we do have.
>
> It's a company. It's an organized company. It has people within that company play different roles. And then on the outside you have the suppliers, right, feeding—feeding that entity and working along with it.

Tr. Vol. 8 (dkt. 1842) at 1583. It is true that this description centers Miller and MIC rather than Karapedyan and Stepanyan; that is understandable, given that Miller and MIC, and not Karapedyan and Stepanyan, were on trial. But the description of the Karapedyan–Stepanyan Enterprise in the indictment does not require that any particular participants be at the center of the enterprise: Rather, it requires only that the enterprise be "a group of people who have associated together for a common purpose of engaging in a course of

conduct over a period of time," Jury Instructions at 25. The "common purpose[s]" listed in the indictment included "[o]btaining profits and property for its members and associates through the commission of criminal acts, including . . . mail, wire, and bank fraud, the unlicensed wholesale distribution of drugs, and money laundering," through the "creat[ion] [of] shell businesses to engage in the sale of improperly procured and handled drugs," and the "creat[ion] [of] false drug pedigree information . . . to facilitate their sales of improperly procured and handled drugs." SSI ¶¶ 31–32. This is precisely what the government proved to the jury that Miller, MIC, and its suppliers did as part of the larger enterprise. See, e.g., Tr. Vol. 3 (dkt. 1810) at 414–16 (James Russo's testimony regarding the suppliers for the drugs MIC sold); Tr. Vol. 7 (dkt. 1829) at 1251–53 (Yassin Gomez's testimony that he "did whatever David Miller asked [him] to do," and was not involved in purchasing or selling drugs or creating documentation about those drugs); Tr. Vol. 3 at 584–86 (Fernando Galan's testimony that Miller told him to falsely state that Cardinal Health was the source of the drugs he and Ricardo Jurado sold to Miller); Ex. 125 (an email in which Miller states that proposed website language about drug pedigrees was "accurate").

### 2. "Employed by or Associated With"

Miller also argues that he was neither "employed by [n]or associated with the (non-existent)" Karapedyan–Stepanyan Enterprise. Mot. at 5. But this argument depends on a cramped understanding of that enterprise that does not comport with the description of the enterprise in the second superseding indictment, as discussed above. The government put forth evidence that Miller assisted in the creation and operation of shell businesses, like B&Y, and he and his employees created false pedigrees to induce customers to purchase the drugs, believing them to be from reputable suppliers. Thus, he was associated with the enterprise as it was described in the indictment.

### 3. "Conduct or Participate"

Further, Miller argues that he did not "conduct or participate" in the affairs of the enterprise because he was not "involved in the operation or management" of any

7

Karapedian–Stepanyan Enterprise. Mot. at 5. This argument fails for the same reasons as the last one—a rational juror could easily conclude that Miller was involved in the operation or management of the enterprise described above.[4]

### B.   Counts 2 Through 12: Mail and Wire Fraud

At trial, the government was required to prove the following elements to convict Miller[5] on one count of conspiracy to commit mail and wire fraud (Count 2) and ten counts of mail fraud (Counts 3 through 12): (1) "the individual knowingly participated in or devised a scheme or plan to defraud;" (2) "the statements made as part of the scheme were material;" (3) "the defendant acted with intent to defraud, that is, the intent to deceive and cheat;" and (4) the defendant used the mails and wires to carry out their scheme. Jury Instructions at 31–32; Ninth Circuit Model Jury Instructions §§ 15.32, 15.35.[6]

Miller argues that the Court's failure to instruct the jury in accordance with Miller's view of the law as to two elements of mail and wire fraud—scheme to defraud and intent to defraud—was in error.

#### 1.   Scheme to Defraud

At trial, Miller proposed the following instruction: "To establish the existence of a scheme or plan to defraud, the government must prove beyond a reasonable doubt that the scheme or plan, if completed as intended, would cause harm to a property interest of the alleged victim." Defendants' Proposed Jury Instructions (dkt. 1817) at 17. The Court instead gave the following instruction: "To establish the existence of a scheme or plan to

---

[4] Miller also argues that the evidence is insufficient to establish a violation of the predicate racketeering acts, including mail and wire fraud and money laundering. See Mot. at 6. Because the evidence was sufficient to convict on those substantive counts, see infra Sections III.B, III.C, that argument also fails.

[5] Only Miller is charged with a conspiracy to commit mail and wire fraud (Count 2). Miller and MIC were both charged in Counts 3 through 12, the substantive mail fraud counts.

[6] To convict Miller on the mail and wire fraud conspiracy (Count 2), the government was required to prove two additional elements: agreement to commit at least one crime of mail or wire fraud, and "the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." Jury Instructions at 30; Ninth Circuit Model Jury Instructions § 11.1. Miller does not dispute the government's proof as to these elements.

8

defraud, the Government must prove beyond a reasonable doubt that the object of the scheme was to obtain money or property from the alleged victims." Jury Instructions at 34. Miller argues that the Court erred in declining to give Defendants' instruction because "intended harm to the alleged victim's property interests" is a required element of mail and wire fraud and the government did not meet its burden on that element. Mot. at 6.

Under binding Supreme Court and Ninth Circuit precedent, a "scheme to defraud" requires that "an object" of the scheme is to "obtain [the victim's] money or property." Kelly v. United States, 140 S. Ct. 1565, 1568 (2020); see also United States v. Yates, 16 F.4th 256, 264 (9th Cir. 2021) ("A scheme to defraud 'must be one to deceive the bank and deprive it of something of value,' that is, money or property." (quoting Shaw v. United States, 500 U.S. 63, 72 (2016)). Miller's proposed instruction limits the "scheme to defraud" element more than binding caselaw does. Again and again, courts interpret the element as a scheme to "deprive [the victim] of something of value," i.e., "money or property," not just a "property interest." United States v. Miller, 953 F.3d 1095, 1102–03 (9th Cir. 2020) (quoting Shaw, 580 U.S. at 72).

To the extent other cases discuss deprivation of "property interests," they do so in contexts where it is unclear exactly what the defendant intended to deprive the victim of. In Yates, for example, two defendants were found guilty of a conspiracy to bank fraud, charged with attempting to "conceal the true financial condition of the Bank and to create a better financial picture of the Bank [for] the Board of Directors, shareholders (current and prospective), regulators and the public." 16 F.4th at 263. Following Kelly's instruction that the intended "loss to the victim must be an object of the fraud," id. at 264 (quoting Kelly, 140 S. Ct. at 1573–74), the Yates Court discussed precisely what "property interests" the defendants conspired to deprive the bank of, ranging from "accurate financial information in the bank's books and records," to "the defendants' salaries [and] bonuses" and "the use of bank funds." Id. at 264. But this lengthy discussion of "property interests" was necessary because the Yates defendants did not clearly deprive the bank of other, more traditional kinds of "money or property," because they deceived, ultimately, to help

9

the bank succeed. Id.

In comparison, this is a simple case. Miller and MIC deceived (i.e., generating and disseminating false pedigrees) to induce pharmacies and distributors to purchase drugs that they understood had met the FDA's regulatory requirements for safety and storage, but Miller knew in fact did not. Miller's "object" in providing these false pedigrees was to "obtain [his victim's] money or property" by selling them drugs that he knew did not meet the regulatory standards indicated by the pedigrees. Miller deceived his customers; his "object" was to obtain his customer's money and sell them an inferior product without their knowledge. The Court was not required to instruct the jury about "harm" to Miller's victims' "property interests" when "the object of the scheme was to obtain money or property from the alleged victims." Jury Instructions at 34.

### 2. Intent to Defraud

At trial, Miller proposed the following instruction: "To prove an intent to cheat, the government must establish that the defendant intended to cause loss or other harm to the alleged victim's money or property." Defendants' Proposed Jury Instructions at 21. The Court did not give this instruction because it was superfluous and, depending on how it would be interpreted by the jury, incorrect.

The Court instructed the jury on the meaning of an "intent to defraud," which requires the intent to "deceive and cheat," and the meaning of a "scheme to defraud" which requires that the government prove beyond a reasonable doubt "that the object of the scheme was to obtain money or property from the alleged victims." Jury Instructions at 32, 34. Thus, the jury was already required to decide whether the "object" of the scheme was to deprive the victim of money or property, rendering Miller's instruction defining an "intent to cheat" superfluous. See supra Section II.B.1. But more fundamentally, to establish an "intent to cheat," the government need not prove that the defendant intended to cause ultimate loss or harm to the victim. See Shaw, 580 U.S. at 67–68 (holding that the bank fraud statute, "while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss"). If the

Court had given Miller's proposed instruction and the jury had understood the instruction to mean that intended ultimate loss or harm was required, the jury would have convicted (or acquitted) Miller based on an incorrect instruction.

Accordingly, the jury was instructed properly on the elements of mail and wire fraud, and the government's evidence was sufficient to convict on Counts 2 through 12.

### C.     Count 13: Money Laundering Conspiracy

To find Miller[7] guilty of conspiracy to launder monetary instruments, the government was required to prove that "there was an agreement between two or more persons to commit at least one crime of laundering monetary instruments," and Miller "became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it." Jury Instructions at 37; Ninth Circuit Model Jury Instructions § 11.1. Laundering monetary instruments consists of the following elements: First, "a financial transaction involving property that represented the proceeds of mail and wire fraud;" Second, Miller "knew that the property represented the proceeds of some form of unlawful activity;" and third, Miller "knew that the transaction was designed in whole or in part to conceal or disguise the nature of the proceeds." Jury Instructions at 38; Ninth Circuit Model Jury Instructions § 18.4.

Miller argues that the government failed to prove three elements: First, any agreement between Miller and any other member of a money laundering conspiracy to launder monetary instruments; second, Miller's knowledge that the transaction was designed in whole or in part to conceal or disguise the nature of the proceeds; and third, that the money laundering agreement involved the "proceeds" of mail and wire fraud at all. See Mot. at 8–11.

#### 1.     Agreement

To prove an agreement to enter into a conspiracy, "a formal agreement is not necessary; rather, the agreement may be inferred from the defendant['s] acts pursuant to

---

[7] Only Miller, and not MIC, was charged with a money laundering conspiracy.

the scheme, or other circumstantial evidence." United States v. Bibbero, 749 F.2d 581, 587 (9th Cir. 1984).

The government presented plenty of evidence from which Miller's agreement to enter into a money laundering conspiracy can be inferred. Rami Houchan, for example, testified that in 2009, Artur Stepanyan had offered to help him start a wholesale electronics business. Tr. Vol. 6 (dkt. 1824) at 1037. Stepanyan told him to go to an office in Tustin, California, to meet "the attorney who was going to take care of the paperwork" to start his business, David Miller. Id. at 1038–39. When Houchan got there, the paperwork had already been filled out, with the name "Panda Capital Group." Id. at 1038–39. Houchan signed the documents and opened three bank accounts for Panda Capital shortly thereafter, at Stepanyan's urging. Id. at 1044–1046. In the bank documents, Panda Capital was described in described as a pharmaceutical business, not an electronics business, as Houchan had been led to believe he was starting with Stepanyan. Id. at 1046–47. Stepanyan then began transferring large amounts of money to Panda Capital's different accounts, and Houchan figured out that the money was coming from E-Tail Network and Miller. Id. at 1053–54; 1061–63; Ex. 456. The obvious inference is that Stepanyan and Miller had no intention of helping Houchan with any electronics wholesale business; rather, they conspired to set up Panda Capital as a conduit for Miller to transfer money from E-Tail Network to the Stepanyans without drawing suspicion.

Yassin Gomez's testimony, too, provides evidence of agreement to use B&Y as a front to transfer money between MIC and its suppliers. Gomez described at least two occasions where he opened B&Y bank accounts at Miller's request. See Tr. Vol. 7 at 1223, 1237. Gomez understood that the B&Y accounts were opened so MIC could pay their suppliers through those accounts. Id. at 1241–42. Gomez explained that when only he had access to B&Y's accounts, he would wire money to suppliers in amounts and at times MIC told him to do so; once the Minnesota Wells Fargo account was opened, with Miller as a signatory, MIC employees began paying their suppliers directly out of that B&Y account. Id. at 1259–69. This, too, presents circumstantial evidence of Miller's

agreement with others at MIC to shield their transactions with their suppliers by paying them through B&Y accounts.

Miller contends that B&Y's purpose in the structure was "drug laundering," that is, to make it appear as though the drugs were coming from B&Y, thus rendering those sales legitimate in the eyes of authorities and pharmacies who purchased them. See Reply at 7. That was undoubtedly one reason for B&Y's existence, and certainly the reason that B&Y was listed on pedigrees; but the reason B&Y was on these transactions was to make the payments appear legitimate. As the government points out, there was no reason that MIC could not have paid its suppliers directly, even if the pedigrees indicated that the drugs were coming from B&Y. See Opp'n at 13. The reason to insert B&Y into the payment stream, at the very least in part, was to distance MIC from the payments to its suppliers—the very essence of money laundering. See United States v. Wilkes, 662 F.3d 524, 545 (9th Cir. 2011) ("The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds . . . ." (quoting United States v. Adefehinti, 510 F.3d 319, 322 (D.C. Cir. 2007))).

Fernando Galan's testimony told a similar story: That Miller and MIC would pay for drugs received from Ricardo Jurado to several different accounts, in the names of different businesses, sometimes located in different countries. Tr. Vol. 3 at 598–600. Galan testified that Miller would approve these new accounts and pay Jurado through them. Id. at 601. This evidence, too, was sufficient to prove agreement between Jurado, Galan, and Miller.

Therefore, because the government presented ample evidence of multiple agreements to launder money, Miller's argument on this point fails.[8]

---

[8] Miller also argues that the government failed to prove agreement between Miller and Brad Ludes to launder money from Miller's businesses for his personal use, including paying for renovations to his beach house. See Mot. at 9. But the government never argued at trial that any money laundering agreement existed between Miller and Ludes; rather, it only argued that the money used to pay Miller's mortgage and his contractor came, in a convoluted fashion, from MIC and B&Y, and represented the proceeds of illegal activity. See, e.g., Tr. Vol. 2 (dkt. 1808) at 155, 161; Tr. Vol. 8 at 1592. Therefore, the Court need not decide whether any agreement to launder money between Miller and Ludes existed when the government did not argue for such an agreement at

13

### 2. Knowledge of Design to Conceal or Disguise Proceeds

This same evidence—Houchan, Gomez, and Galan's testimony and underlying exhibits—also proved that Miller "knew that these transactions were designed in whole or in part to conceal or disguise the nature of the proceeds." Jury Instructions at 38. The use of Panda Capital to send funds from E-Tail Network to Stepanyan signifies that Miller knew that sending funds to Stepanyan directly would raise alarms; this transaction, by its very nature, was designed to place a buffer between Miller and Stepanyan. The transactions with B&Y evinced the same purpose—to put a facially legitimate wholesale distributor between MIC and its suppliers. Finally, Galan's testimony that Miller agreed to send money to Jurado at different accounts, with different names, in different countries, signals that Miller knew that his payments to Jurado needed to be "convoluted" in order to conceal the nature of their transactions. See Wilkes, 662 F.3d at 545.[9]

Accordingly, based on the evidence the government put forth a trial, a rational jury could have convicted Miller of a money laundering conspiracy.

### D. Motion for a New Trial

Finally, just as none of Miller's arguments warrant an acquittal, they do not warrant a new trial. The evidence does not "preponderate . . . against the verdict" such that "a serious miscarriage of justice" may have occurred, and therefore the Court does not exercise its discretion to try this complex and thoroughly litigated case a second time. Alston, 974 F.2d at 1211–12.

### IV. CONCLUSION

For the foregoing reasons, Miller's motion is DENIED.

**IT IS SO ORDERED.**

Dated: May 2, 2023

CHARLES R. BREYER
United States District Judge

---

trial.

[9] Miller also argues that the government failed to prove that the money laundering involved "proceeds of specified unlawful activity," in this case, mail and wire fraud. See Jury Instructions at 38; 18 U.S.C. § 1956. Because the evidence was sufficient to convict on those substantive counts, see supra Section III.B, that argument also fails.

14